**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |
|---|---|
| **HEIDI RALSTON, on behalf of the ARCO DB Companies, Inc. Employee Stock Ownership Plan, and on behalf of a class of all other persons similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**AEGIS TRUST COMPANY, LLC, ROBERT E. LESSER, RICHARD G. SCHULTZE, MARQUIS J. "MARK" MUMMERT, JEFFREY L. COOK, and JOHN AND JANE DOES 1–10,**<br><br>**Defendants.** | **Case No.** |

**COMPLAINT**

Plaintiff Heidi Ralston, by her undersigned attorneys, on behalf of the ARCO DB

Companies, Inc. Employee Stock Ownership Plan, and similarly situated participants in the Plan

and their beneficiaries, alleges upon personal knowledge, the investigation of her counsel, and

upon information and belief as to all other matters, as to which allegations she believes

substantial evidentiary support will exist after a reasonable opportunity for further investigation

and discovery, as follows:

**BACKGROUND**

1.      Plaintiff Heidi Ralston ("Plaintiff") brings this suit against Aegis Trust Company,

LLC and its Managing Member, Robert E. Lesser (together, "the Trustee"), who served as the

fiduciary trustee for the ARCO DB Companies, Inc. Employee Stock Ownership Plan (the

1

"Plan" or the "ESOP") at the time the Plan acquired shares of ARCO DB Companies, Inc. ("ADB" or the "Company," f/k/a ARCO Design/Build Parent, Inc.) in 2019; Richard G. Schultze, Marquis J. "Mark" Mummert, and Jeffrey L. Cook, Company directors and parties in interest to the Plan from whom the Plan acquired the stock (and/or from trusts or other entities owned directly or indirectly or controlled or held by them or of which they held a beneficial interest); and John and Jane Does 1–10, parties in interest to the Plan from whom the Plan acquired the stock (together with Schultze, Mummert and Cook, "Selling Shareholders").

2.      Plaintiff is a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan who was vested in shares of ADB allocated to her account in the Plan.

3.      This action is brought under Sections 404, 405, 406, 409, and 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1106, 1109, and 1132(a), for losses suffered by the Plan and its participants caused by the Trustee when it caused the Plan to engage in ERISA prohibited transactions in connection with its leveraged purchase of ADB stock from the Selling Shareholders, and other plan-wide relief. Specifically, the Trustee caused the Plan to engage in prohibited transactions under ERISA Section 406(a)(1)(A), (B) and (D), 29 U.S.C. § 1106(a)(1)(A), (B) and (D), when it caused the Plan to purchase Company stock from the Selling Shareholders and transfer assets of the Plan to them, and financed that purchase with loans from the Selling Shareholders and the Company, who were parties in interest to the Plan. The Selling Shareholders, as the counterparties to the transactions and ADB directors and senior officers, were knowing participants in the prohibited transactions.

2

4.      As alleged below, the Plan, Plaintiff, and all Plan participants have been injured and participants deprived of hard-earned retirement benefits resulting from Defendants' violations of ERISA.

5.      At all relevant times, ADB was a privately-held company, the Plan's sponsor, and a party in interest to the Plan. ADB established the Plan to be retroactively effective as of January 1, 2019.

6.      On December 31, 2019, the Plan, through its trust, the ARCO DB Employee Stock Ownership Trust ("ESOT"), purchased from the party in interest Selling Shareholders, directly or indirectly, 816,600 shares of the Company's common stock for $197,866,326. The ESOP financed the entire purchase with loans from the Selling Shareholders that were subsequently assigned to the Company (the purchase and loan transactions together, the "ESOP Transaction" or "Transaction").

7.      The Trustee represented the Plan and its participants as fiduciary trustee in the ESOP Transaction. It had sole and exclusive authority to negotiate the terms of the ESOP Transaction and to authorize the Transaction on the Plan's behalf. The stock and loan transactions that the Trustee caused the Plan to enter into with parties in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), were prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a).

8.      The Selling Shareholders—including Defendants Schultze, Mummert, Cook, and the John and Jane Doe defendants—sold shares in the ESOP Transaction. Schultze, Mummert and Cook were all Directors of ADB, with Schultze and Cook serving as the Co-Chairmen of the Board. Mummert was ADB's Chief Executive Officer (CEO) and Schultze was its President. Schultze was a founder in 1995 of ADB's lead operating company, ARCO Design/Build. Cook

3

was a founder in 1992 of the ARCO family of construction companies of which ADB and ARCO Design/Build are a part.

9.    The ESOP paid more than fair market value for ADB stock for several reasons as detailed below. Among other things, the Trustee and its financial advisor relied on unreasonably optimistic financial projections. At the time of the ESOP Transaction, ADB leadership set an aggressive target of 10% profit margins even though ADB had regularly failed to meet such projections and a 10% margin was much higher than industry average. The Trustee and its financial advisor caused the ESOP to pay a control value even though the ESOP did not obtain control of ADB. And the Trustee and its advisor applied a discount for lack of marketability premised on the ESOP obtaining put rights that it did not receive, as put rights ran to participants and not to the buyer ESOP. These valuation errors caused the ESOP to pay tens of millions of dollars in excess of fair market value.

10.    Employees of ADB and participants in the ADB ESOP including Plaintiff have not been provided details about the ESOP Transaction or provided with documents that memorialized the Transaction. As a result, many of the specific details of the ESOP Transaction are "peculiarly within the possession and control of [Defendants.]" *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer.").

11.    Schultze, Mummert and Cook were ADB's senior leadership, and they were centrally involved in conceiving of, facilitating, and executing the Transaction and had access to and knowledge of company financials and projections, Company control features before and

4

after the Transaction, and other Company information. Schultze, Mummert, Cook, and the other Selling Shareholders are liable under ERISA for knowingly participating in the prohibited transactions. Schultze, Mummert, Cook, and other Selling Shareholders are also liable for breaching fiduciary and co-fiduciary duties.

12. Through this action, Plaintiff seeks to enforce her rights under ERISA and the Plan. Specifically, Plaintiff seeks, in the alternative, to recover the losses incurred by the Plan and the improper profits realized by Defendants resulting from their causing prohibited transactions and knowingly participating in the prohibited transactions, and equitable relief, including reformation of Transaction contracts, rescission of the Transaction, and removal of the Trustee as a fiduciary and enjoinment of it from acting as a fiduciary for any employee benefit plan that covers or includes any ADB employees or members of the Class. Plaintiff requests that Defendants be required to restore any losses to the Plan arising from their ERISA violations, Defendants be ordered to disgorge to the Plan any improper profits, that these prohibited transactions be declared void, and any monies recovered for the Plan to be allocated to the accounts of the Class members.

## JURISDICTION AND VENUE

13. This action arises under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, and is brought by Plaintiff under ERISA § 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) and (a)(3), to require Defendants to make good to the Plan losses resulting from their violations of the provisions of Title I of ERISA, to restore to the Plan any profits that have been made by breaching fiduciaries, parties in interest, or others through the receipt or use of Plan assets in violation of ERISA, and to obtain other appropriate equitable relief and legal remedies in order to redress violations and enforce the provisions of ERISA.

5

14.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and it has original jurisdiction pursuant to 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, because some of the events or omissions giving rise to the claims occurred in this District, and because a defendant resides or may be found in this District. The Plan is administered in St. Louis, Missouri.

## PARTIES

16.     **Plaintiff Heidi Ralston** is and has been a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since 2019. Plaintiff resides in Oswego, Illinois. She was a Tech Analyst and Construction Applications Lead at ARCO Business Services, supporting ADB. She was employed there from August 2017 to September 2022. At the time she left employment at ARCO, she was vested in shares of ADB in her ESOP account.

17.     **Defendant Aegis Trust Company, LLC** ("Aegis Trust"), a New Hampshire limited liability company, is the surviving entity following a merger effective on July 18, 2023, with Aegis Fiduciary Services, LLC ("Aegis Fiduciary," and together with Aegis Trust, "Aegis"), which at the time of the ESOP Transaction was a New York limited liability company. Aegis Fiduciary was founded in 2017. Aegis Trust was created on May 4, 2023.

18.     At all relevant times, Aegis provided trustee services to privately held companies wishing to sponsor employee stock ownership plans. Aegis Fiduciary's "type of business or services" was reported by the company to be "Fiduciary services."

19.     **Defendant Robert E. Lesser**, at the time of the ESOP Transaction, was the Managing Member, Chief Executive Officer (CEO), and owner of Aegis Fiduciary. Defendant Lesser is the President and CEO of Aegis Trust.

20.     Robert E. Lesser and Aegis Fiduciary, hereinafter together the "Trustee," served as the Trustee and fiduciaries of the Plan at the time of the ESOP Transaction. The Trustee had sole and exclusive discretion to authorize and negotiate the ESOP Transaction on behalf of the Plan. Aegis Fiduciary provided staff—including the Aegis Fiduciary Committee—fiduciary insurance, an "internal process" and documents including its "list of the legal and financial documents needed to conduct its due diligence," and office space for its and Lesser's use as transaction trustee in the ESOP Transaction.

21.     In an "Aegis Fiduciary Brochure" published on May 20, 2019, Aegis Fiduciary advertised that it was: "SPECIALIZING IN TRUSTEE SERVICES TO PRIVATELY-HELD COMPANIES THAT SPONSOR EMPLOYEE STOCK OWNERSHIP PLANS (ESOPS)." Aegis Fiduciary advertised that: "Aegis's only business is providing trustee services" and "Aegis maintains sufficient insurance to cover any losses associated with claims by third parties." Aegis Fiduciary further stated: "When an ESOP-sponsoring company appoints the Aegis team as trustee, Aegis is responsible for making the fiduciary decision to acquire the stock of that company from its owners." Aegis Fiduciary explained that "selling shareholders and Aegis as trustee negotiates the terms of the transaction." Aegis Fiduciary further represented that: "Aegis makes all decisions through its fiduciary committee that consists of experienced attorneys, a certified public accountant and an accredited valuation advisor." Aegis Fiduciary further explained: "The committee also focuses on loan terms, compensation for the selling shareholders, board composition, synthetic equity and other pertinent issues."

22.     Aegis Fiduciary utilized its Fiduciary Committee to investigate, negotiate, and authorize the ESOP Transaction here.

23.    At the time of the ESOP Transaction, the Trustee was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the trustee within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a), and because it exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

24.    **Defendant Richard G. Schultze** was a co-founder in 1995 of ARCO Design/Build, which is now a principal operating company of ADB. He was at the time of the ESOP Transaction a Co-Chairman of ADB's Board of Directors and ADB's President, and was a director and officer or a person with powers or responsibilities similar to those of a director and officer of related organizations whose employees were covered by the Plan. He was a selling shareholder in the ESOP Transaction, directly or indirectly.

25.    Defendant Schultze was a "party in interest" under ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H), at the time of the ESOP Transaction as a director and officer of ADB, and/or as a director or officer or individual having powers or responsibilities similar to those of a director or officer of related organizations whose eligible employees were covered by the Plan; and/or, on information and belief, as a 10 percent or more shareholder, directly or indirectly, of ADB. Schultze was also a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), as a fiduciary because he served on the ADB Board of Directors and exercised the Board's fiduciary authority to appoint other fiduciaries including the ESOP Trustee and the ESOP Committee, and the Company is the Plan's Named Fiduciary.

26.    **Defendant Marquis J. "Mark" Mummert** was at the time of the ESOP Transaction a Director and the CEO of ADB, and was a director and officer or a person with

powers or responsibilities similar to those of a director and officer of related organizations whose employees were covered by the Plan. He was a selling shareholder in the ESOP Transaction, directly or indirectly.

27. Defendant Mummert was a "party in interest" under ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H), at the time of the ESOP Transaction as a director and officer of ADB, and/or as a director or officer or individual having powers or responsibilities similar to those of a director or officer of related organizations whose eligible employees were covered by the Plan; and/or, on information and belief, as a 10 percent or more shareholder, directly or indirectly, of ADB. Mummert was also a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), as a fiduciary because he served on the ADB Board of Directors and exercised the Board's fiduciary authority to appoint other fiduciaries including the ESOP Trustee and the ESOP Committee, and the Company is the Plan's Named Fiduciary.

28. **Defendant Jeffrey L. Cook** was a co-founder in 1992 of the ARCO family of construction companies. He was at the time of the ESOP Transaction a Co-Chairman of ADB's Board of Directors, and was a director or a person with powers or responsibilities similar to those of a director of related organizations whose employees were covered by the Plan. He was a selling shareholder in the ESOP Transaction, directly or indirectly. He resides or may be found in this District.

29. Defendant Cook was a "party in interest" under ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H), at the time of the ESOP Transaction as a director of ADB, and/or as a director or individual having powers or responsibilities similar to those of a director of related organizations whose eligible employees were covered by the Plan; and/or, on information and belief, as a 10 percent or more shareholder, directly or indirectly, of ADB. Cook was also a party in interest

9

under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), as a fiduciary because he served on the ADB Board of Directors and exercised the Board's fiduciary authority to appoint other fiduciaries including the ESOP Trustee and the ESOP Committee, and the Company is the Plan's Named Fiduciary.

30.    **Defendants John and Jane Doe 1–10** are Selling Shareholders who sold ADB stock to the Plan in the ESOP Transaction, directly or indirectly, whose identities are unknown to Plaintiff. They include parties in interest to the Plan. John and Jane Does 1–10 include directors, officers and employees of ADB and/or directors, officers and employees or individuals having powers or responsibilities similar to those of directors or officers of related organizations whose employees are covered by the Plan or trusts or other entities owned directly or indirectly or controlled or held by such persons or of which they held a beneficial interest, and they knowingly participated, directly or indirectly, in the ERISA-prohibited transactions. Discovery is needed to identify John and Jane Does 1–10. Once their identities are ascertained, Plaintiff will substitute their names.

**FACTUAL ALLEGATIONS**

**ADB and the ARCO Family of Construction Companies**

31.    ADB is a national design-build construction industry firm that includes approximately eighteen divisional offices in cities around the country and thirty-two divisions. ADB is part of what is billed as "A Family of Construction Companies" referred to as ARCO, founded in 1992 in St. Louis, Missouri by Defendant Cook and Richard R. Arnoldy. At the time of the ESOP Transaction, ADB and the other companies within the ARCO Family all relied on a centralized financial software system, and utilized marketing, information technology, and other operational and back-office services provided through ARCO Business Services.

32.     In 1995, ARCO established ARCO Design/Build, led by founder Defendant Schultze. Defendant Mummert became the first Project Manager and later rose to CEO and Co-Chairman of the Board of Directors. This was ARCO's first affiliate expansion, and the first time Defendant Cook and Richard R. Arnoldy sold stock in the company. ARCO Design/Build is now a principal operating company owned by the holding company ADB.

33.     ADB was incorporated in Delaware on December 18, 2019, thirteen days before the ESOP Transaction. ADB was initially incorporated with the name ARCO Design/Build Parent, Inc. Then the Board renamed it as ARCO Design/Build Companies, Inc., by Certificate of Amendment of Certificate of Incorporation filed in Delaware on July 15, 2020. Finally by Certificate of Amendment of Certificate of Incorporation filed in Delaware on September 3, 2020, the name was changed to ARCO DB Companies, Inc., the Company's current name.

34.     Effective December 27, 2019, four days before the ESOP Transaction, numerous companies were merged into ADB. Following some changes to company names and conversions from corporations to limited liability companies, ADB's subsidiaries include but are not limited to: ARCO Design/Build, LLC; ARCO Design/Build - BTS, LLC; ARCO Design/Build SE, LLC; ARCO Design/Build Midwest, LLC; ARCO Design/Build Southwest, LLC; ARCO Design/Build Industrial Philadelphia, LLC; ARCO Design/Build Industrial Baltimore, LLC; ARCO Design/Build Industrial New York, LLC; ADB Design Services LLC; and ARCO Design/Build Jacksonville, LLC.

35.     ADB established the Plan with a retroactive effective date of January 1, 2019.

36.     Qualifying employees of ADB and its related organizations who participate in the Plan, and leased employees and co-employed persons through ARCO Business Services, are covered by the Plan.

11

37.    ADB is and was from the inception of the Plan the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

38.    The Plan's most recent 2023 Form 5500, filed on October 15, 2024, reports that ADB's address, in its capacities as Plan Sponsor and Plan Administrator, is at 900 N. Rock Hill Road, St. Louis, Missouri 63119. ADB reported this same address on its annual Forms 5500 in 2019, 2020, 2021, and 2022.

39.    ADB is and was from the inception of the Plan the Plan's Administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and the Named Fiduciary of the Plan within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a). The Company is responsible for the administration and management of the Plan. The Company's Board of Directors has appointed an ESOP Committee to act as its agent in performing these duties.

40.    ADB is and was an ERISA fiduciary to the Plan at all relevant times because it is the Plan's Named Fiduciary; it is the Plan Administrator; and it possesses and exercised through the Board of Directors the fiduciary power to appoint and remove other Plan fiduciaries, including the ESOT trustee and the ESOP Committee.

41.    As a Plan fiduciary, and an employer whose employees are covered by the Plan, ADB is and was at the time of the ESOP Transaction a party in interest to the Plan under ERISA § 3(14)(A) and (C), 29 U.S.C. § 1002(14)(A) and (C).

**The Plan and the ESOP Transaction**

42.    The Plan is a pension benefit plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1). It is a

12

defined contribution plan, under which a separate individual account is maintained for each participant.

43.    The Plan is designed and operates as an employee stock ownership plan (ESOP) within the meaning of Internal Revenue Code Section 4975(e)(7) and Section 407(d)(6) of ERISA, 29 U.S.C. § 1107(d)(6). The Plan was designed to invest primarily in the employer securities of ADB. The Plan's principal asset was ADB stock at all times since the ESOP Transaction. ADB stock is not and never was readily tradeable on an established securities market.

44.    On December 31, 2019, the Plan, through its ESOT, purchased from Selling Shareholders, directly or indirectly, 816,000 shares of ADB common stock for $197,866,326.

45.    The ESOP financed the purchase of the ADB shares with loans payable to the Selling Shareholders which were subsequently assigned to the Company bringing the Plan's indebtedness to approximately $197,866,000 at December 31, 2019. The term loan agreement with the Company provides all outstanding principal and accrued interest thereon are due in full by December 31, 2079.

46.    ADB represents that the company "is 100% associate owned as an ESOP." Thus, as a result of the ESOP Transaction, the Plan and the participants who participated in it became owners of, on information and belief, all of the issued shares of ADB common stock. Because rank and file ADB employees, including Plaintiff, did not participate in the development, negotiation, or closing of the ESOP Transaction, and have not been provided with copies of the Transaction documents, they lack information regarding specific terms of the Transaction.

47.    Though the Plan purchased the ADB stock on December 31, 2019, and established the ESOP effective as of January 1, 2019, it was not until January 14, 2020, that

ADB leadership announced the establishment of the ESOP to ADB employees – called "associates" at ADB – at a Company-wide meeting (hereinafter the "January 2020 ESOP announcement"). During that meeting – simulcast to ADB offices nationwide – Defendant Mummert toasted the ADB associates, stating "Congratulations to you all for celebrating ARCO DB becoming 100% associate owned as of now!" ADB leadership handed out promotional items reading "We Own It!"

48.     The Notes to Financial Statements to the Plan's 2019–2023 Forms 5500 each state: "The Plan invests in Company common stock and has indebtedness to the Company. These are related-party and party-in-interest transactions. Such parties are parties in interest under ERISA."

49.     As noted above, ADB is just one component of what is billed as "A Family of Construction Companies" referred to as ARCO that was founded by Jeffrey L. Cook and Richard R. Arnoldy in 1992. Other affiliated ARCO companies have and had directors and officers overlapping with ADB. Some of these affiliated ARCO companies have also established ESOPs and sold company stock to such plans; prior to such sales to those other ESOPs, the shareholders of the various ARCO companies overlapped.

**The Fiduciary Trustee**

50.     ADB, by its Board of Directors, appointed the Trustee as trustee of the Plan's ESOT prior to the ESOP Transaction at a time when Selling Shareholders owned and controlled the Company and/or the operating companies that were merged into the Company. As trustee, the Trustee had sole and exclusive authority to negotiate and approve the ESOP Transaction on behalf of the Plan, including the price the Plan paid for ADB stock. Therefore, Defendants Schultze, Mummert, Cook and other Selling Shareholders who served as directors—the seller-

14

side in the ESOP Transaction—appointed the buyer-side counter-party trustee in the Transaction. An unconflicted independent fiduciary did not make the appointment.

51.    The Trustee received fees from ADB for its services as transaction trustee in the ESOP Transaction to the buyer-side Plan under a contract made prior to the Selling Shareholders' sale of ADB stock to the Plan, while the Selling Shareholders still owned ADB or the operating companies merged into ADB. The Trustee also received fees after the ESOP Transaction because it was appointed ongoing trustee to the Plan to serve following the closing of the Transaction.

**The Role of Tenor ESOP Partners**

52.    Prior to consummating the ESOP Transaction, the Selling Shareholders selected an advisor, Tenor ESOP Partners (f/k/a Tenor Capital Partners, LLC) ("Tenor"), to act as the "architect" or "quarterback" for the Transaction. Among other things, Tenor's role was to select the buy-side Trustee for the Selling Shareholders to appoint to purportedly represent the Plan and its participants. Tenor also ensured corporate and Plan governance control was retained by the Selling Shareholders so they did not lose control to employees in the ESOP Transaction.

53.    Selling Shareholders, through ADB and as its Board, appointed the Trustee to be the buy-side trustee on the advice of Tenor. Tenor also advised the sell-side in other ESOP transactions involving ARCO family companies.

54.    Tenor's standard contract with selling shareholders in ESOP transactions provides that Tenor's services will include: "assemble the team responsible to execute the Transaction and administer the ESOP after closing, including, ESOT (employee stock ownership trust) trustee."

55.    At a deposition in February 2021, Todd Butler, founder and Managing Partner of Tenor, could name only three ESOP trustee businesses that he generally tries to engage for the

15

buyer-side on deals, one of which was Aegis, which with its Managing Member Lesser is the defendant fiduciary Trustee here.

56.     "[T]he ESOP world [is] a very incestuous community" because of the "significant long-term business relationships" resulting from parties working together in many ESOP deals, and ESOP trustees maintain "extensive and lucrative business relationships" with seller-side advisors. *See Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 771, 779 (4th Cir. 2019) (citation omitted).

57.     The Trustee, which sits on the buy-side in ESOP transactions, derives substantial business from its relationship with the seller-side ESOP advisor Tenor. The observation that the ESOP world is a "very incestuous community" is shown true here. *See also Brundle v. Wilmington Tr. N.A.*, 241 F. Supp. 3d 610, 637, 643 (E.D. Va. 2017) (on trial decision, court finds trustee did "lackluster due diligence" and its explanation that ESOP trustees do a "different level of due diligence" than a "real world buyer is going to do" "does not satisfy," and that "the ESOP world ... [being] a very incestuous community" may have been the cause of the trustee becoming "complacent"), *aff'd* 919 F.3d 763 (4th Cir. 2019).

58.     Tenor quarterbacked this ESOP transaction and the ESOP transaction for at least one other ARCO company. Tenor guided the decision makers on those ESOP transactions to pick Lesser and Aegis to serve as Trustee for the buy-side in those transactions. Lesser and Aegis were highly motivated and incentivized to cater to please the sell-side in these transactions because robust due diligence and tough negotiating might cause Tenor to recommend someone else to serve as trustee. Further, serving as ongoing ESOP Trustee after ESOP transactions provided Lesser and Aegis with an annual revenue stream from multiple ESOPs for doing very little work.

59.     Jacob M. Stefan (current ADB President and former CEO of ARCO Design/Build - BTS), at the January 14, 2020 ESOP announcement of the establishment of the ESOP to employees in a company-wide meeting simulcast to offices nationwide, stated that it was "comforting" that "André [Schnabl] and Todd [Butler]" of Tenor and the ADB management team were "so focused on keeping ARCO, ARCO, and making sure that we weren't going to change." Joe Matthews, Division Chief Executive Officer at ARCO Design/Build, added: "nothing's gonna change in the way that the business is run . . . ." In sum, Tenor and the Selling Shareholders built a corporate governance structure that kept the Selling Shareholders firmly in control after they sold the ADB stock to the ESOP.

**The Plan was Injured by its Overpayment for Company Stock in the ESOP Transaction**

60.     Since on or about the time of the Company's formation and the ESOP Transaction, ADB has been under the control of long-time directors, officers, and former shareholders of ADB and its subsidiaries, including Defendant Schultze, Defendant Mummert, Defendant Cook, and Stephen F. Holste, as well as Jabob M. Stefan and Robert Steigerwald who became directors in 2023 (together, the "Inside Directors"). The Inside Directors are current directors of ADB.

61.     In addition to Defendants Schultze, Mummert, and Cook, the Selling Shareholders include one or more directors and/or officers of ADB and the companies merged into it to become subsidiaries or "divisions."

62.     At the January 14, 2020 ESOP announcement, John Atcheson, Vice President at ARCO Design/Build in Houston, thanked "Rick, Mark, Jeff, Dick, Steve, Chuck, and Mike" who "spent an enormous amount of time . . . in putting this ESOP together." He was referring to Defendants Schultze, Mummert, and Cook, as well as Richard R. Arnoldy, Stephen F. Holste

17

(Treasurer, CFO, Vice President-Finance), Charles E. Franke II (Secretary), and Michael Boyle (Senior Controller).

63.    Schultze, Mummert, Cook, and other Selling Shareholders were centrally involved in conceiving, facilitating, and executing the Transaction, including conducting a process for ownership transition from Selling Shareholders to an ESOP rather than to an outside buyer; hiring and working with Transaction advisors for ADB and Selling Shareholders; hiring a compliant Trustee to nominally represent the counter-party Plan; creating ADB including by creating and/or restructuring other ARCO companies in advance of the ESOP Transaction, and causing corporate mergers in advance of the Transaction; directing the preparation of financial projections by ADB's management and staff for use in valuations in the Transaction; and approving ADB's lending of over $197 million to the ESOT in the leveraged transaction.

64.    Schultze, Mummert, Cook, and other Selling Shareholders retained control of the ADB Board after the ESOP Transaction as a result of their positions as directors and officers; through employees, appointees, and/or proxies holding positions as directors and/or officers; due to the millions of dollars of Company and ESOT debt they held from the ESOP Transaction including but not limited to rights arising from warrants or other synthetic equity issued to them; through various transaction documents, including the stock purchase agreement and warrants; and through a compliant Trustee that could be fired by ADB's Board of Directors, making any alleged ESOP control illusory.

65.    Selling Shareholders further retained control over ADB's Board of Directors after the ESOP purchased the Company because, under the Plan's governing documents, the Trustee is subject to the direction of the ESOP Committee, which is appointed by and an agent of the Board, for voting Company Stock.

18

66.     Plan participants are permitted to vote ADB stock allocated to their accounts on certain matters such as a sale of substantially all the assets of ADB, a merger or consolidation, or a recapitalization of ADB. These are critical prerogatives of control that did not accrue to the ESOP when it acquired ADB. The Trustee is directed by the ESOP Committee on voting unallocated ADB stock on the above matters that Plan participants are permitted to vote on. The Trustee is directed by the ESOP Committee on voting ADB stock on all other matters, including the election of members of the Board. This means the Trustee had no discretion to vote on Board members or any other valuable prerogative of control such as setting management compensation, strategic planning, and the like. The ESOP had no control over the enterprise whatsoever.

67.     Tenor ESOP Partners, the architect of the ESOP Transaction, advertises that an "ESOP Misconception" is that "Selling shareholders will lose control to employees." Tenor Managing Partner André Schnabl explained in a November 21, 2019 episode of the business podcast Decision Vision: "The reality is that the selling shareholder, although they have sold a part of their company or potentially 100 percent of their company, they still control the board of directors." In a July 13, 2017 episode of another business podcast called "Life After Business," Mr. Schnabl spoke to the same point: "The selling shareholders continue to control the business. They are not removing control and providing the trust with the ability to run their business or control their business. Nothing has happened from a control perspective until the selling shareholders are long gone. They will appoint the entire board; they can fire the trustee; they decide on that all day-to-day operating decisions nothing has changed. So it's extremely important that selling shareholders don't consider this a typical sale where the buyer is now in control. In this case, the seller remains in control until they put 100 percent of their money out

19

of, out of the deal and in fact under certain circumstances they can continue to control thereafter, uh, because of their warrant positions."

68.    The lone "independent" ADB director from the ESOP Transaction to at least 2024, Gary Gray, is currently a partner at Tenor, further showing the "incestuous" nature of the ESOP community. Gray did not have the power to overrule the majority Inside Directors even if he wanted to challenge their control, which is implausible given Tenor's relationship with ADB and the Selling Shareholders.

69.    According to Gary Gray, as stated in a March 1, 2025 article: "Regardless of the amount of interest sold by selling shareholders, they can retain control of the business post-closing, or vest control in a management team (which may include family members)."

70.    Gary Gray said in a podcast that a "misconception" of ESOP transactions is of selling shareholders "losing control" such that employees "control the business." He explained: "That's just simply not the case. Operationally nothing changes. Nothing changes with the business. Uh, and the current CEO, President, uh which is likely the majority shareholder at the time, uh may not be but likely it is, can really stay on and continue to operate the business as long as they want to."

71.    The design of the ESOP Transaction and Company control features denied the Plan the control it should have received for its $197 million purchase.

72.    The Trustee valued the ADB stock on a control basis by using an industry capital structure instead of the Company's actual capital structure in its income method, which yielded a control value. But the Plan did not obtain control of the Company, as explained above, because Schultze, Mummert, Cook, and other Selling Shareholders maintained control over the Board

and, through the Board, ADB. The Plan should have received a discount for lack of control, but it did not. This means the Plan paid more than fair market value for the stock.

73.    The Trustee failed to apply a sufficient discount for lack of marketability (DLOM) to its valuation in the ESOP Transaction because it failed to sufficiently account for the lack of marketability for the private stock that was purchased by the ESOT. The valuation applied an insufficient DLOM because Plan participants, beneficial owners rather than legal owners, have a right to have the Company or the Trustee buy any shares of ADB stock distributed to participants that is not publicly traded (the Put Option). But the ESOT was the purchaser in the ESOP Transaction and participants' sales to the Company or ESOT do not reduce the lack of marketability to the ESOT of the stock the ESOT owns. In other words, the ESOP's acquisition price was for more than fair market value because the DLOM applied in the transaction was premised on put rights that did not run to the buyer. In addition, the Plan's lack of control over ADB made it lack marketability. The Plan overpaid for ADB stock in the Transaction due to the Trustee's improper application of DLOM of 5%. Restricted stock studies and other data sources indicate the DLOM should have been at least 10%, if not more. Applying a modest DLOM of 10% by itself means the ESOP paid approximately $10 million more than fair market value.

74.    In determining the value of private company stock, the fair market value standard is the price at which the stock would change hands between a hypothetical willing buyer and a hypothetical willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all relevant facts. Adequate consideration for an ESOP transaction is governed by reasonably knowledgeable, hypothetical buyers and sellers rather than tailoring a "hypothetical" buyer to a particular buyer like an ESOP trustee. Reducing the DLOM based on

21

the Put Option was therefore improper because the value was based on the specific buyer, an ESOP.

75.    The Plan does not prohibit "synthetic equity." Synthetic equity may include, *inter alia*, warrants, stock options, restricted stock, a deferred insurance stock right, a stock appreciation right payable in stock, or similar interest or right that gives the holder the right to acquire or receive stock of an S Corporation in the future, a right to a future payment (payable in cash or any other form other than stock of the S corporation) from an S corporation that is based on the value of the stock of the S corporation, such as a stock appreciation right that is payable in cash or phantom stock unit with respect to stock of an S corporation that is payable in cash, or other forms of nonqualified deferred compensation.

76.    ADB is an S corporation and dividend income consists primarily of S corporation distributions from the Company.

77.    Mr. Schnabl of Tenor encourages the use of warrants in ESOP transactions because they can allow selling shareholders to receive "an amount over and above fair value" for their companies, which "can be as much as 20 or 30 percent of the entire business," which over the course of a decade can be "worth more than the entire business was worth the day you sold it." The value of the warrant can be manipulated because, as Mr. Schnabl has noted: "a warrant is the right to buy shares in the business at a price that is agreed-upon." He further explained the warrant position "is something that is unique to these, these ESOPs." Warrants thus may give selling shareholders who take debt for the sale of their companies in ESOP transactions compensation above and beyond the amount of the interest rate on the loan paid by an ESOP. "It is the second bite of the apple," Mr. Schnabl explains.

22

78.    Gary Gray also describes "a second bite of the apple," which is that "immediately following closing" of an ESOP transaction in which an ESOP buys "100% of the stock", "we're gonna carve out about 30% of the stock" for selling shareholders and key management personnel. In his view, "One of the misconceptions about an ESOP is that everybody has to be treated exactly the same."

79.    While the Plan, through the ESOT, purchased 816,600 shares of ADB common stock, ADB was authorized to issue 2,000,000 shares.

80.    Synthetic equity is usually granted to high level executives by the board of directors. Here, Defendants Schultze, Mummert, Cook, and other Selling Shareholders were on the Board and/or high-level officers or "key management personnel" in the relevant period. Selling Shareholders received synthetic equity in, or thereafter as allowed in, the ESOP Transaction.

81.    When synthetic equity is granted, it dilutes the value of company shares held by ESOP participants and transfers that value to those persons holding the synthetic equity. Thus, when synthetic equity is granted, it reduces the value of the ADB shares owned by the Plan. This either harms the economic interest of Plan participants or, if the synthetic equity is not properly taken into account in the valuation of ADB stock, the stock is reported at inflated values.

82.    A rational buyer under no compulsion to purchase ADB under terms like these (*i.e.*, a Board controlled by Selling Shareholders, who could dilute the value of all ADB stock by granting themselves synthetic equity) would not have purchased the company stock that the ESOP was forced to purchase, or would have demanded a significant discount in the price of the stock to account for these defects of ownership.

23

83.     The Plan overpaid for ADB, and Selling Shareholders received improper profits, as a result of warrants and/or other synthetic equity issued to them. A rational buyer under no compulsion to purchase ADB would not have agreed to the warrants/synthetic equity upon its purchase of ADB stock.

84.     The Trustee's appraisal of ADB stock in the ESOP Transaction was based upon a combination of income, market, and asset valuation approaches. ADB management provided data from historical and projected financial information of the Company to the Trustee for the valuation of ADB stock in the ESOP Transaction. Forecasts prepared by ADB management were used in the valuation methodology employed by the Trustee and its financial advisor. At the time of the ESOP Transaction, ADB leadership set an "audacious" growth target, with an aggressive goal of 10% annual profit margins, but it frequently did not meet those profit targets. A 10% margin was much higher than industry averages so it was not reasonable to assume that the Company would meet these profit targets.

85.     In addition, the valuation used "comparable" publicly traded companies that were different from ADB in terms of corporate structure, markets or industries served, offering differing services and having differing segments, and/or having different risk profiles and fixed capital needs. Using guideline public companies to determine the fair market value of ADB had the effect of improperly increasing the indicated value because the public companies were too different from ADB to provide a reliable indication of value.

86.     The Trustee did not adequately challenge information provided by ADB management or the valuation techniques of its financial advisor and therefore failed to negotiate for the true, lower fair market value price of ADB stock as of the date of the ESOP Transaction.

87.     Another ESOP trustee, Miguel Paredes of Prudent Fiduciary Services, LLC, has said to participants of a different ESOP that he decided to leave the Department of Labor and become an ESOP trustee because some ESOP trustees, "maybe like your former trustee [Defendant Lesser], didn't weren't [sic] quite understanding their responsibilities and didn't do as good of a job as they needed to do."

88.     The Trustee was rewarded with engagement as the Plan's ongoing trustee by Selling Shareholders, who still controlled ADB, upon completing the ESOP Transaction to their satisfaction. The Trustee was also rewarded with appointments as transaction trustee for other ESOP transactions involving other companies in the ARCO family of construction companies, and on information and belief as ongoing trustee for such plans.

89.     In breach of its duties as fiduciary and trustee under ERISA, the Trustee caused the Plan to engage in prohibited transactions. Based on their respective roles within ADB, their participation in the ESOP Transaction, and their knowledge from authorizing the Company to participate in the loan component of the ESOP Transaction, Defendants Schultze, Mummert, Cook and the other Selling Shareholders knowingly participated in the prohibited transactions.

90.     The Plan suffered losses as a result of the ERISA prohibited transactions alleged herein, in an amount to be determined following discovery and expert analysis of non-public information concerning the Trustee's and its financial advisor's valuation and due diligence methodologies, ADB financials and growth projections, and other documents and information that were considered or should have been considered in the ESOP Transaction.

91.     As a result of the prohibited transactions, Plaintiff and the Plan's participants, whose losses are coterminous with the Plan's, received diminished stock allocations, saw their

25

Plan take on excessive debt to finance the Transaction, and suffered monetary losses to their individual Plan accounts.

92.     The Trustee is liable to the Plan for the difference between the price paid by the Plan and the fair market value of ADB shares at the time of the ESOP Transaction.

93.     Selling Shareholders—including Schultze, Mummert, Cook, and John and Jane Does 1–10—are liable to the Plan to repay the difference between the price they received and the fair market value of their ADB shares at the time of the ESOP Transaction.

94.     Defendants Schultze, Mummert, and Cook, and other John and Jane Doe defendants, are liable to the Plan for its losses resulting from breaches of their fiduciary and co-fiduciary duties under ERISA.

95.     All consideration paid to the Selling Shareholders in connection with the ESOP Transaction, including warrants and notes they received, is in the current possession of the Selling Shareholders and/or traceable.

## CLAIMS FOR RELIEF

## COUNT I

**Causing Prohibited Transactions Forbidden by ERISA § 406(a), 29 U.S.C. § 1106(a), Against Lesser and Aegis Trust**

96.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

97.     ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a plan fiduciary, here the Trustee, Defendants Robert E. Lesser and Aegis Trust, from causing a plan, here the Plan, to engage in a sale or exchange of any property, here ADB stock, with a party in interest, here Selling Shareholders, as took place in the ESOP Transaction.

98.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits the Trustee from causing the Plan to borrow money from a party in interest, here Selling Shareholders and ADB, as took place in the ESOP Transaction.

99.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits the Trustee from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer to a party in interest, here Selling Shareholders, of any assets of the Plan, as took place in the ESOP Transaction with the transfer of Plan assets to Selling Shareholders for stock.

100.    The stock and loan transactions between the Plan and the parties in interest were authorized by the Trustee in its capacity as trustee for the Plan.

101.    The Trustee caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a), in the ESOP Transaction.

102.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

103.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief to a plan under ERISA § 409.

104.    The Trustee has caused losses to the Plan by the prohibited transactions in an amount to be proved specifically at trial.

## COUNT II

### Knowing Participation in ERISA Violations Pursuant to 29 U.S.C. § 1132(a)(3), Against Schultze, Mummert, Cook, and John and Jane Does 1–10

105. Plaintiff incorporates the preceding paragraphs as though set forth herein.

106. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), *inter alia*, permits a plan participant to bring a civil action to obtain appropriate equitable relief to redress violations of the provisions of Title I of ERISA, or to enforce the provisions of Title I of ERISA or the terms of a plan.

107. The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

108. As a result of the prohibited stock transaction described above, Selling Shareholders received Plan assets in payment above fair market value for their ADB stock.

109. Selling Shareholders were ADB directors and/or officers and/or employees and were parties in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14), as described above.

110. Selling Shareholders knew or should have known (1) about the existence of the Plan, (2) about the Plan's purchase of their ADB stock and taking of loans from them and ADB in the ESOP Transaction, (3) that the Trustee was the fiduciary trustee to the Plan, (4) that Selling Shareholders included directors, officers, and employees of ADB and related organizations that participate in the Plan, Plan fiduciaries, and/or 10% or more shareholders, (5) that the Trustee caused the Plan's ESOT to engage in the stock and loan transactions, and (6) that they received monetary assets of the Plan in the ESOP Transaction.

28

111.    As parties to and/or beneficiaries of the stock purchase agreement containing the terms of the Plan's stock purchase from Selling Shareholders and countersigned by the Trustee on behalf of the ESOT; as the sellers of $197 million in stock with an interest in having knowledge of and/or competently negotiating the Transaction; as officers and directors of ADB, which participated in the loan component of the Transaction with their approval, and which was the sponsor, Named Fiduciary, and fiduciary administrator of the Plan; as Plan fiduciaries; as directors and officers of ADB, whose team provided company financial information and projections to the buyer side, and which made other disclosures in response to requests for information that showed the scope of the Trustee's inadequate due diligence, and that the Trustee caused the ESOT to pay above fair market value for ADB stock; and as directors/officers/owners who knew the control features of the Company and Transaction that caused the Plan to overpay on a control basis or due to want of a discount for lack of control and knew other facts that made management projections unreasonably optimistic, Selling Shareholders were aware of sufficient facts that the ESOP Transaction constituted a prohibited transaction; that the Plan paid more than fair market value in the Transaction; that the Trustee did not adequately investigate and value the stock; and that the loans were not primarily for the benefit of participants and beneficiaries of the plan but for the interests of Selling Shareholders.

112.    Further, it may be inferred that Selling Shareholders had "reasonable knowledge of all relevant facts" because the fair market value standard is that fair market value is the price at which the stock would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and *both having reasonable knowledge of all relevant facts*. Selling Shareholders had knowledge of the relevant facts, and based upon them caused

ADB to take part in the ESOP Transaction, and took part in the Transaction themselves, directly or indirectly.

113.    Selling Shareholders are liable for knowingly participating in violations of ERISA § 406(a)(1)(A), (B) and (D), 29 U.S.C. § 1106(a)(1)(A), (B) and (D), alleged in Count I.

114.    Selling Shareholders have profited from the prohibited transactions in an amount to be proven at trial, and upon information and belief, they remain in possession of assets that belong to the Plan.

115.    Selling Shareholders are subject to appropriate equitable relief including disgorgement or restitution of any ill-gotten gains they received in connection with the ESOP Transaction, accounting for profits, having a constructive trust placed on any proceeds received (or which are traceable thereto), reformation of the ESOP Transaction contracts to provide the Plan pays no more than fair market value for ADB stock as of the date of the Transaction and to give the Plan powers or other consideration for which it paid but did not receive, having the transaction rescinded, requiring all or part of the consideration to be restored to the Plan, or to be subject to other appropriate equitable relief.

## COUNT III

**Breach of Fiduciary and Co-Fiduciary Duties Pursuant to 29 U.S.C. §§ 1104, 1105
Against Schultze, Mummert, Cook, and John and Jane Does 1–10**

116.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

117.    A person who appoints a trustee for an ESOP transaction is a fiduciary.

118.    An appointing fiduciary must act diligently and prudently in the selection of a trustee and has an ongoing duty to monitor the trustee and provide information to the trustee in the appointing fiduciary's possession that the trustee needs to carry out its duties.

119.    Selling Shareholders hired Tenor because Tenor explained they would "continue to control the business. They are not removing control and providing the trust with the ability to run their business or control their business. Nothing has happened from a control perspective until the selling shareholders are long gone. They will appoint the entire board; they can fire the trustee; they decide on that all day-to-day operating decisions nothing has changed. So it's extremely important that selling shareholders don't consider this a typical sale where the buyer is now in control. In this case, the seller remains in control until they put 100 percent of their money out of, out of the deal and in fact under certain circumstances they can continue to control thereafter, uh, because of their warrant positions."

120.    ADB's Board—including Defendants Schultze, Mummert, Cook, and John and Jane Does defendants—made the decision to appoint the Trustee to serve as trustee for the Plan. They are appointing fiduciaries.

121.    Selling Shareholders failed to engage in a diligent and prudent process in selecting the Trustee. Relying on Tenor, they selected a trustee well-known to Tenor that causes the ESOPs it represents to pay control values for companies without acquiring control. The Selling Shareholders and Tenor dangled the prospect of fees for multiple ESOP transactions and the ongoing annual trustee fees for an ESOP to encourage the Trustee to allow them to keep control after selling ADB. At all times, Selling Shareholders operated under the guidance of Tenor and benefited from Tenor's cozy relationship with the Trustee and knew they would keep control and knew they would receive warrants that had a very large dilutive impact on the ESOP's equity.

122.    Selling Shareholders possessed information that the Trustee needed to fulfill its duties in ensuring the Plan paid no more than fair market value, including that the financial

31

projections provided by Selling Shareholders and Tenor were unreasonably optimistic because they projected profit margins that were higher than historic margins, ADB had failed to meet such projections in the past, and the margins were significantly higher than industry average. Selling Shareholders knew or should have known that the Trustee was proceeding with the ESOP Transaction despite inadequate due diligence because the Selling Shareholders knew that the Trustee had not received all material information regarding the Company.

123.    As a result of the prohibited stock transaction described above, Selling Shareholders received Plan assets in payment above fair market value for their ADB stock.

124.    Selling Shareholders breached their fiduciary duties by selecting a trustee to serve their interests and not the Plan's or its participants' and knowingly providing overly optimistic projections to the Trustee.

125.    In addition, the Selling Shareholders breached co-fiduciary duties.

126.    As parties to and/or beneficiaries of the stock purchase agreement containing the terms of the Plan's stock purchase from Selling Shareholders and countersigned by the Trustee on behalf of the ESOT; as the sellers of $197 million in stock with an interest in having knowledge of and/or competently negotiating the Transaction; as officers and directors of ADB, which participated in the loan component of the Transaction with their approval, and which was the sponsor, Named Fiduciary, and fiduciary administrator of the Plan; as Plan fiduciaries; as directors and officers of ADB, whose team provided Company financial information and projections to the buyer side, and which made other disclosures in response to requests for information that showed the scope of the Trustee's inadequate due diligence, and that the Trustee caused the ESOT to pay above fair market value for ADB stock; and as directors/officers/owners who knew the control features of the Company and Transaction that caused the Plan to overpay

32

on a control basis and/or due to want of a discount for lack of control and knew other facts that made management projections unreasonably optimistic, Selling Shareholders were aware of sufficient facts that the ESOP Transaction constituted a prohibited transaction; that the Plan paid more than fair market value in the Transaction; that the Trustee did not adequately investigate and value the stock; and that the loans were not primarily for the benefit of participants and beneficiaries of the plan but for the interests of Selling Shareholders.

127. Further, it may be inferred that Selling Shareholders had "reasonable knowledge of all relevant facts" because the fair market value standard is that fair market value is the price at which the stock would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and *both having reasonable knowledge of all relevant facts*. Selling Shareholders had knowledge of the relevant facts, and based upon them caused ADB to take part in the ESOP Transaction, and took part in the Transaction themselves, directly or indirectly.

128. Selling Shareholders knowingly participated in the Trustee's prohibited transaction violations because they knew or should have known (1) about the existence of the Plan, (2) about the Plan's purchase of their ADB stock and taking of loans from them and ADB in the ESOP Transaction, (3) that the Trustee was the fiduciary trustee to the Plan, (4) that Selling Shareholders included directors, officers, and employees of ADB and related organizations that participate in the Plan, Plan fiduciaries, and/or 10% or more shareholders, (5) that the Trustee caused the Plan's ESOT to engage in the stock and loan transactions, (6) that they received monetary assets of the Plan in the ESOP Transaction, (7) that the Trustee would pay a control value even though the ESOP would not get control, and (8) the Trustee would rely

33

on overly optimistic financial projections that would cause ADB to be overvalued. This violated 29 U.S.C. § 1105(a)(1).

129.    Selling Shareholders knew the Trustee caused a prohibited transaction because they knew or should have known (1) about the existence of the Plan, (2) about the Plan's purchase of their ADB stock and taking of loans from them and ADB in the ESOP Transaction, (3) that the Trustee was the fiduciary trustee to the Plan, (4) that Selling Shareholders included directors, officers, and employees of ADB and related organizations that participate in the Plan, Plan fiduciaries, and/or 10% or more shareholders, (5) that the Trustee caused the Plan's ESOT to engage in the stock and loan transactions, (6) that they received monetary assets of the Plan in the ESOP Transaction, (7) that the Trustee would pay a control value even though the ESOP would not get control, and (8) the Trustee would rely on overly optimistic financial projections that would cause ADB to be overvalued. Although Selling Shareholders knew or should have known about the Trustee's prohibited transaction violations, they have done nothing to remedy the violations. Thus the Selling Shareholders breached their duties under 29 U.S.C. § 1105(a)(3).

130.    Selling Shareholders are liable under 29 U.S.C. § 1109 to restore all losses to the Plan, to disgorge profits, and are subject to other appropriate equitable or remedial relief.

## CLASS ACTION ALLEGATIONS

131.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b), on behalf of the following class:

> All vested participants in the ARCO DB Companies, Inc. Employee Stock Ownership Plan ("Plan") and the beneficiaries of such participants as of the date of the December 31, 2019 ESOP Transaction or any time thereafter. Excluded from the Class are the shareholders who sold their ARCO DB Companies, Inc. (f/k/a ARCO Design/Build Parent, Inc.) ("ADB") stock to the Plan, directly or indirectly, and their immediate families; the directors and officers of ADB and their immediate families; the Plan Committee members and their immediate

34

families; and legal representatives, successors, and assigns of any such excluded persons.

132.    The Class is so numerous that joinder of all members is impracticable. Although the exact number and identities of Class members are unknown to Plaintiff at this time, the Plan's most recent Form 5500 filing reports that as of December 31, 2023, there were 619 participants in the Plan.

133.    Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

> i.      Whether Defendants Lesser and Aegis served as trustee in the Plan's acquisition of ADB stock;
>
> ii.     Whether Defendants Lesser and Aegis were ERISA fiduciaries of the Plan;
>
> iii.    Whether Defendants Lesser and Aegis caused the Plan to engage in prohibited transactions under ERISA by permitting the Plan to purchase ADB stock from, take loans from, and transfer assets of the Plan to, parties in interest;
>
> iv.     Whether ADB was a party in interest and gave a loan to the Plan;
>
> v.      Whether Selling Shareholders were parties in interest;
>
> vi.     Whether Selling Shareholders were fiduciaries for the Plan;
>
> vii.    Whether Selling Shareholders gave loans to the Plan;
>
> viii.   Whether Selling Shareholders knowingly participated in the prohibited transactions;
>
> ix.     Whether Selling Shareholders breached fiduciary and co-fiduciary duties;

x.    The amount of losses suffered by the Plan and its participants as a result of the Trustee's ERISA violations; and

xi.    The appropriate relief for Defendants' violations of ERISA.

134.    Plaintiff's claims are typical of those of the Class. For example, Plaintiff, like other Plan participants in the Class, suffered a diminution in the value of her Plan account because the Plan paid above fair market value and took on excessive loans for ADB stock, resulting in her being allocated fewer shares of stock, and she continues to suffer such losses in the present because the Trustee failed to correct the overpayment by the Plan.

135.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex class actions, ERISA, and employee benefits litigation.

136.    Class certification of Plaintiff's Claims for Relief for the alleged violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members, and/or because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants.

137.    The names and addresses of the Class members are available from the Plan. Notice will be provided to all members of the Class to the extent required by Fed. R. Civ. P. 23.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

A.      Declare that Defendants Aegis and Lesser, as Trustee, caused the Plan to engage in prohibited transactions and thereby breached duties under ERISA;

B.      Declare that Selling Shareholders knowingly participated in a prohibited transaction with the Plan in violation of ERISA;

C.      Declare that Selling Shareholders breached fiduciary and co-fiduciary duties;

D.      Order Defendants to make good to the Plan and/or to any successor trust(s) the losses resulting from the violations of ERISA and disgorge any profits they made through use of assets of the Plan;

E.      Order reformation of the ESOP Transaction contracts to provide the Plan pays no more than fair market value for ADB stock as of the date of the Transaction, to provide the Plan receives that for which it paid including control of ADB where it did not receive a discount for lack of control and paid on a control basis and did not obtain control of ADB, and any other appropriate reformation;

F.      Order rescission of the ESOP Transaction;

G.      Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries, including but not limited to surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

H.      Order the proceeds of any recovery for the Plan to be allocated to the accounts of the class members to make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

37

I. Order the allocation to the accounts of the class members of the additional shares of stock that would have been allocated but for the Plan's overpayment on company stock and Defendants' breaches of ERISA;

J. Remove the Trustee as Plan fiduciary, enjoin it from acting as a fiduciary for any employee benefit plan that covers or includes any ADB employees or members of the Class, and appoint an independent fiduciary in place of the Trustee;

K. Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

L. Enjoin Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the Plan participants' rights can be adjudicated;

M. Enjoin Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the Plan's and Plan participants' ability to recover the same;

N. Order Defendants to pay prejudgment and post-judgment interest;

O. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiff as class representative, and her counsel as class counsel; and

P. Award such other and further relief as the Court deems equitable and just.

38

Dated:  September 5, 2025

*/s/ Mark G. Boyko*
Mark G. Boyko, 57318(MO)
**BAILEY & GLASSER LLP**
34 N. Gore Avenue, Suite 102
Webster Groves, MO 63119
Telephone: (314) 863-5446
Facsimile: (304) 342-1110
mboyko@baileyglasser.com

Gregory Y. Porter, 458603(DC) *pro hac vice* to be filed
Ryan T. Jenny, 495863(DC) *pro hac vice* to be filed
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
rjenny@baileyglasser.com

Daniel Feinberg, 135983(CA) *pro hac vice* to be filed
Todd Jackson, 202598(CA) *pro hac vice* to be filed
**FEINBERG, JACKSON,**
**WORTHMAN & WASOW, LLP**
2030 Addison Street, Suite 500
Berkeley, California 94704
Telephone: (510) 269-7998
Facsimile: (510) 269-7994
dan@feinbergjackson.com
todd@feinbergjackson.com

Mary Bortscheller, 0399634(MN) *pro hac vice* to be filed
**FEINBERG, JACKSON,**
**WORTHMAN & WASOW, LLP**
2112 Broadway Street NE, Suite 225 #137
Minneapolis, MN 55413
Telephone: (510) 606-5219
Facsimile: (510) 269-7994
mary@feinbergjackson.com

*Attorneys for Plaintiff Heidi Ralston*